WhitakeR, Judge,
delivered the opinion of the court:
This case is before us on defendant’s motion to dismiss ^plaintiff’s petition. The petition was supplemented by a •bill of particulars.
Plaintiff, a Swiss partnership, a legal entity under Swiss law, alleges that, in order to induce defendant to adopt an • antiaircraft gun which it had invented and on which it had .•secured Swiss patents, it delivered to the Bureau of .Naval *616 Ordnance one of these guns, together with a supply of ammunition for it, for the purpose of demonstration, and that after the Bureau of Naval Ordnancé had tested the gun it later adopted it as standard equipment and manufactured many of them and large quantities of the ammunition for it.
■ Plaintiff does not claim to have secüred a United States patent on the gun, but it does say that it “made available' full manufacturing rights* including the use of the.gun design, working drawings* toolings, formulas, specifications of materials, technical advice-and ‘know how’, and also the full and detailed working drawings for the jigs, tools, gauges, and other items necessary, for the successful production of said gun and ammunition.” It does not allege that it made these things available to the United States, nor to-whom it did make them available; but it seeks compensation from the United States because the defendant later caused to be manufactured for, itself a number of these guns and,, therefore, it says it must be inferred that the defendant used these things which plaintiff “made' available.” It seeks compensation both on the theory that the United States had entered into an implied contract with it to pay for the use-of them and also on the theory that the United States was liable to it for its alleged use of them under the Fifth Amend- ■ ment to the Constitution. , . .
About a year after plaintiff demonstrated its gun to the-Bureau of Naval Ordnance the defendant did' cause to be-manufactured a number of these guns for its account. Intervening and prior events, hówéver, are important. The-chronology of them is significant.
In 1939 the British Admiralty adopted plaintiff’s gun as a standard British weapon and entered into a licensing-agreement with plaintiff to manufacture it in the British Empire. The manufacturing • capacity of Great Britain, however, was not equal to the job of making as many of these guns as Great Britain needed and it was determined’ to supplement' the English output with that of American» manufacturers. Accordingly, in May 1940, plaintiff sent one of its agents to this country, who arranged with several American manufacturers to engage in the production of its< weapon, known as the Oerlikon cannon. In so doing plain *617 tiff’s agent was working under tbe auspices of the British Purchasing Commission, but with the knowledge and consent of the United States Government.
In 1940 a corporation was formed by plaintiff’s agent to assemble the gun from parts manufactured by various American contractors. Plaintiff’s agent subscribed to 25 percent of the stock of this corporation, and the balance was subscribed by American investors. The company was incorporated under the name of the American Oerlikon Gazda Corporation, familiarly known as the AOG Corporation. The United States Government owned no stock therein and had no part in the organization of this company.
In June 1940 plaintiff’s agent arranged for one of plaintiff’s factory-trained experts to come to this country to give instructions and advice to American manufacturers relating to the manufacture and operation of the Oerlikon cannon.
All of this was done to further the production of this cannon for the British Government.
In the meantime, plaintiff and the British Purchasing Commission were undertaking to agree on a licensing agreement for the manufacture of this gun and ammunition in the United States, as a supplement to the licensing agreement for the manufacture of the gun in Great Britain. An agreement was finally entered into on March 8, 1941, under which plaintiff gave to the British Government an exclusive license to manufacture and use and sell the gun and ammunition'in the United States. The agreement, however, was subject to the consent of the Swiss Government, and this consent was never obtained, and in default thereof the agreement was declared to be inoperative and of no effect. Notwithstanding this, however, the manufacture of the gun continued.
While all of these transactions were carried on with the knowledge and consent of the United States Government, they were all carried on between plaintiff and the British Purchasing Commission, and the United States Government was not a party thereto.
However, in March 1941 the United States Government enacted certain “lend-lease” Acts. Under these Acts, upon request from certain foreign governments, the United States *618 would procure tbe materials requested for its own account,, and then lend or lease them to the foreign government requesting them. After the passage of these Acts, the Navy Department on and after August 9,1941, undertook the procurement of these Oerlikon cannon, and then loaned or leased them to the British Government. Until this time the' defendant had had no contractual relations with plaintiff either expressly or by implication.
This was more than a year after plaintiff, at the instance of the British Government, had first made available to American manufacturers its designs, working drawings, toolings, formulas, and specifications of materials, and had given to them its technical advice and “know how”, including the instructions given American manufacturers by Mr. Lame-raner, plaintiff’s factory-trained expert whom it brought over to this country for this purpose. It follows that when the defendant began having these guns manufactured for its account, the manufacturers were already in possession of the drawings, designs, and manufacturing “know how” which plaintiff had furnished them at the behest of the British Purchasing Commission; and; hence, defendant cannot be said to have impliedly • agreed to pay for what was already available to those from whom it ordered these guns. The petition does not allege that after the defendant started having these guns manufactured for its account that plaintiff furnished any further technical advice or “know how” to assist in their manufacture. No express contract is alleged.
As stated above, plaintiff did not have an American patent on the gun, nor any American copyright on the drawings and designs to aid in its manufacture.
The licensing agreement of March 8, 1941, entered into between plaintiff and the British Purchasing Commission, had provided that it might be assigned to the United States, but this was never done; on the contrary, when the consent of the Swiss Government could not be obtained, this agreement was declared inoperative and of no effect. There is no allegation that the United States undertook to perform the obligations imposed on the British Purchasing Commission by this agreement, nor are any facts alleged from which we can infer an agreement by the United States to do so.
*619 When this agreement was declared inoperative, the parties to the agreement continued to manufacture the gun, and it might be said that this was done under an implied agreement between plaintiff and the British Purchasing Commission to pay plaintiff in accordance with the terms of that agreement, but nothing is alleged to show that the United States ever assumed the obligations of the British Purchasing Commission thereunder.
Indeed, the petition does not show whether or not the British Purchasing Commission ever paid plaintiff the amounts it would have been due to pay thereunder, if the Swiss Government had approved it. Under it the British Purchasing Commission was due- to pay plaintiff the sum of $200,000 within one week after receipt of proof that the transaction had been approved by the Swiss Government, and an additional $250,000 upon the arrival in the United States of the technical staff which plaintiff obligated itself to furnish',' and an additional $50,000 when all the drawings and lists had been delivered to the British Purchasing Commission. These sums were to apply on the payments due for the licenses issued to the British Government by plaintiff, and for the drawings and services to be supplied, which were $300.00 each on the first 2,000 equipments manufactured for the British Government, $200.00 each on the next 2,000 equipments manufactured, and $100.00 each on the next 6,000 equipments manufactured. Whether or not these sums, or any part of them, were paid plaintiff by the British Government does not appear.
In any event, it does not appear that the United States, expressly agreed to pay these sums, nor are any facts alleged from which such an agreement can be implied.
Defendant did not incur any liability to plaintiff under the 5th Amendment; it took none of plaintiff’s property; it merely ordered from American manufacturers guns which plaintiff had taught these manufacturers how to make. The manufacture of these guns was not protected by any American patent. Defendant did not take any of plaintiff’s property.
Plaintiff’s claim under the Contract Settlement Act is likewise without merit. No agent of the United States expressly *620 or impliedly promised to pay plaintiff anything on account •of the manufacture of these guns. • ■ .
Defendant also raises a serious question of the statute of limitations, but we do not discuss this since we are convinced that plaintiff is not entitled to recover on the merits. ,
Defendant’s motion to dismiss plaintiff’s petition is sustained, .and plaintiff’s petition is dismissed.
Howell, Judge; Madden, Judge; Littleton, Judge; and Jones, Ghief Judge, concur.
In this case (No. 49696) plaintiff’s motion for leave to file an amended petition was filed April 5,1951. ,. The motion was denied. Thereafter plaintiff filed a motion for reconsideration of its former motion.
In an opinion per cúriam July 9, 1951, the former action denying leave to file an amended petition was reaffirmed, and the motion for reconsideration was denied.